In the United States District Court
for the District of Kansas

––––––––––––––

Case No. 21-cv-02573-TC

––––––––––––––

PAULA GULICK, ET AL.,

*Plaintiffs*

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE CO.,

*Defendant*

––––––––––––––

## MEMORANDUM AND ORDER

Plaintiffs Paula Gulick and Sharon Schlehuber brought this putative class action against State Farm Mutual Automobile Insurance Company, asserting a breach of contract claim and seeking a declaratory judgment. Doc. 50. Plaintiffs now move to certify a class, Doc. 69, State Farm moves for summary judgment, Doc. 77, and the parties have filed five motions to exclude or strike expert testimony, Docs. 67, 73, 82, 84, and 126. For the following reasons, one of Plaintiffs' motions to exclude expert testimony, Doc. 82, is granted in part and denied in part, and the rest of the parties' motions to exclude or strike expert testimony, Docs. 67, 73, 84, and 126, are denied. Plaintiffs' motion for class certification, Doc. 69, and State Farm's motion for summary judgment, Doc. 77, are granted in part and denied in part.

## I

### A

Each motion has a different standard that governs resolution. The following describes each applicable standard.

**1.** As noted, the parties challenge the admissibility of each other's experts. The admissibility of expert testimony is guided by Federal Rule

1

of Evidence 702.[1] *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). To fulfill its gatekeeping role, a trial court must ensure that the expert is qualified and that his or her testimony is both reliable and relevant. *Id.* at 1180–81. "Rule 702 requires an expert witness to be qualified by 'knowledge, skill, experience, training, or education.'" *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1029 (10th Cir. 2021). Testimony is reliable if "it is based on sufficient data, sound methods, and the facts of the case." *See Roe*, 42 F.4th at 1181 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). It is relevant if it helps the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020).

**2.** The parties also disagree about whether this case should proceed as a class action. "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). To meet that exception, "a party seeking to maintain a class action must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23. *Id.* (citation and internal quotation marks omitted).

Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A plaintiff requesting class certification "must be prepared to prove . . . in fact" that each requirement is met. *Id.* (emphasis omitted). That may require a court to "'probe behind the pleadings' and examine the facts and evidence in the case." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227–28 (10th Cir. 2013) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021). Even so, consideration of the merits on a motion for class certification is limited to "determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

Rule 23(a) delineates four prerequisites for class certification: numerosity, commonality, typicality, and adequate representation. *See* Fed. R. Civ. P. 23(a). Certification is proper only if a district court "is

---

[1] Federal law governs the admissibility of evidence in federal diversity cases. *Sims v. Great Am. Life Ins.*, 469 F.3d 870, 880 (10th Cir. 2006).

satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 569 U.S. at 33 (quoting *Dukes*, 564 U.S. at 350–51). If the prerequisites are met, a movant must then "satisfy through evidentiary proof" at least one of the defined classes under Rule 23(b). *Id.*

**3.** And finally, State Farm contends that it is entitled to summary judgment. Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670–71.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

In a case where the moving party does not bear the burden of persuasion at trial, the summary judgment rules require that party to show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

This is a dispute about how State Farm valued damaged automobiles that it deemed a total loss. Doc. 50 at ¶ 1. The essence of the plaintiffs' claims is that State Farm systematically underpaid its insureds for their totaled vehicles by using a method that eschewed the fair-market value that its insurance policies required. *Id.* The following describes the factual background and procedural history.

**1.** The named plaintiffs, Paula Gulick and Sharon Schlehuber, are two individuals who purchased automobile insurance policies from State Farm. Doc. 93 at ¶ 4. Each filed a claim with State Farm after one or more of their vehicles were damaged in automobile accidents. *Id.* at ¶ 5. State Farm deemed each of their vehicles a total loss. *Id.*

State Farm's insurance policy explains its options for settling total-loss claims. Doc. 79-7 at 20. It provides as follows:

> We have the right to choose to settle with you or the owner of the covered vehicle in one of the following ways: (a) Pay the cost to repair the covered vehicle minus any applicable deductible. . . . (b) Pay the actual cash value of the covered vehicle minus any applicable deductible. (1) The owner of the covered vehicle and we must agree upon the *actual cash value* of the covered vehicle.

Doc. 79-7 at 20 (emphasis added). If the parties disagree over the actual cash value, the policy defines a purely voluntary appraisal process that cannot take place unless both parties agree to it. *Id.* The policy does not define the term "actual cash value." The parties agree, however, that the language "actual cash value" in State Farm's policy means "fair market value." Doc. 78 at 16; Doc. 93 at 26.

State Farm used an outside vendor, Audatex, to calculate the actual cash value of Plaintiffs' vehicles. Doc. 93 at ¶ 8. The methodology that

Audatex used is the source of the parties' dispute.[2] *Id.* at ¶ 27. To calculate a vehicle's actual cash value, Audatex started by collecting the asking prices of comparable vehicles advertised for sale online within the relevant market area. Doc. 79-8; Doc. 79-9; Doc. 79-10. Specifically relevant to the parties' dispute, Audatex would then adjust the asking price of each comparable vehicle downward by a certain percentage to account for what it calls "typical negotiation." *E.g.*, Doc. 79-8 at 7. This typical negotiation adjustment is based on the assumption that a used vehicle's "selling price may be substantially less than the asking price." *Id.* Audatex determined the amount of the typical negotiation adjustment by obtaining data from used automobile sellers regarding the sales prices of various vehicles and comparing that data to the vehicles' advertised prices. Doc. 69-1 at 19–20. After collecting comparable vehicles and reducing the amount of the typical negotiation adjustment, Audatex would adjust its estimated value to account for factors specific to the totaled vehicle like how many miles the vehicle had traveled, depreciation in the vehicle's equipment, and the condition of the vehicle. *See, e.g.*, Doc. 79-8. Audatex created "Market-Driven Valuation" reports for each of the plaintiff's vehicles that valued the vehicle and explained the valuation's basis. *Id.*

This process applied to each of Plaintiffs' total-loss claims. Doc. 79-8; Doc. 79-9; Doc. 79-10. Take Gulick first. Gulick's Ford Explorer was damaged in an accident in May 2021, and State Farm elected to settle Gulick's claim by paying her the actual cash value of the vehicle. Doc. 93 at ¶¶ 3–5. When State Farm determined how much Gulick's final payment would be, it relied on Audatex's valuation, which applied the typical negotiation adjustment described above. *Id.* at ¶¶ 23–24.

---

[2] This lawsuit is one of many that plaintiffs across the country have brought against State Farm and other automobile insurers. *See Reynolds v. Progressive Direct Ins. Co.*, 346 F.R.D. 120, 128 (N.D. Ala. 2024) (acknowledging the nationwide litigation). Those cases have not specifically dealt with Audatex's methodology, but they have considered materially identical claims about methodologies that apply similar adjustments to the one at issue here. *E.g.*, *Kronenberg v. Allstate Ins. Co.*, 743 F. Supp. 3d 465 (E.D.N.Y. 2024); *Costello v. Mountain Laurel Assurance Co.*, No. 22-CV-35, 2024 WL 239849 (E.D. Tenn. Jan. 22, 2024); *Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 20-2482, 2023 WL 7213796 (W.D. Tenn. Aug. 25, 2023); *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 WL 5181596 (E.D. Pa. Aug. 11, 2023); *Volino v. Progressive Casualty Ins. Co.*, 21 Civ. 6243, 21 Civ. 1714, 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023).

The second named Plaintiff, Schlehuber, brought two separate claims for her vehicles. *Id.* at ¶¶ 1–5. She filed the first claim in December 2016 because her 2013 Nissan Rogue was damaged in an accident. *Id.* at ¶¶ 1 & 5. State Farm followed the same process it did for Gulick's vehicle, relying in part on Audatex's typical negotiation adjustment to value the Nissan. *Id.* at ¶ 10. In August 2018, Schlehuber filed another claim with State Farm. *Id.* at ¶¶ 2 & 5. This time, her 2004 Lexus ES 330 was damaged in an accident. *Id.* at ¶ 2. Audatex estimated the value of Schlehuber's Lexus, but Schlehuber decided to keep the Lexus even though State Farm deemed it a total loss. *Id.* at ¶ 17. State Farm paid Schlehuber to settle the claim, again based on Audatex's valuation. *Id.* at ¶ 21. Schlehuber repaired the Lexus on her own, used it for two years, and traded it in later, ultimately making a profit. *Id.* at ¶ 22.

Things have changed among the parties since the claims were made. For instance, State Farm no longer uses Audatex in Kansas. Doc. 93 at ¶ 39. Nor does it use any methodology that applies a typical negotiation adjustment to total-loss claims. *Id.* In addition, Schlehuber has switched her automobile insurer and no longer contracts with State Farm. *Id.* at ¶ 40. The parties do not specify whether Gulick continues to contract with State Farm to insure her vehicles.

Plaintiffs brought this class action lawsuit to challenge the typical negotiation adjustment that State Farm, through Audatex, applied to its valuations of their vehicles. Doc. 50. Plaintiffs assert that Audatex's methodology relies on the flawed assumption that used-vehicle buyers typically negotiate the sale price to a value below the vehicle's advertised price. Doc. 93 at ¶ 27. Plaintiffs have produced evidence that the negotiation adjustment does not accurately reflect the fair market value of their vehicles because negotiation adjustments do not accurately reflect market realities and are contrary to general standards in the appraisal industry. Doc. 71-1. They reason that negotiated price discounts are atypical because used cars are "priced to market and used car dealers do not deviate down from the advertised cash price with limited exceptions" due to increased price transparency on the internet. Doc. 75-1. Plaintiffs do not contest any portion of Audatex's valuation methodology other than its application of a typical negotiation adjustment. Doc. 93 at 6.

Based on these arguments, Plaintiffs bring two claims. Doc. 50. First, they allege that State Farm breached the insurance contract by using the typical negotiation adjustment to pay them an amount below

the actual cash value of their vehicles. *Id.* at 9. Second, they seek a declaratory judgment against State Farm to clarify the parties' rights and liabilities under the insurance contract. *Id.* at 10.

**2.** The parties make various requests. As noted, these requests include motions seeking the exclusion of experts, to certify this matter as a class, and for summary judgment. The following briefly describes those pleadings.

Both parties rely on expert testimony to support their claims and defenses, and each seeks exclusion of the others' experts. Docs. 67, 73, 82, 84, and 126. Plaintiffs' experts are Jason Merritt and Kirk Felix. Docs. 71-1 & 75-1. Merritt intends to testify how the typical negotiation adjustment conflicts with generally accepted appraisal standards, Doc. 71-1, and Felix will opine that used vehicles tend to sell for their advertised price absent an exception unrelated to the vehicle's fair market value, Doc. 75-1. State Farm moves to exclude both Merritt and Felix, Docs. 67 & 73, and it moves to strike Merritt's second rebuttal expert report as untimely, Doc. 126. State Farm's experts are Philip Fernbach and Laurentius Marais. Docs. 71-9 & 82-2. Fernbach will testify about surveys he conducted and analyzed that show that negotiation is common among used vehicle buyers and sellers in the relevant geographic region. Doc. 71-9. And Marais rebuts Felix's opinions, saying they do not rely on empirical data and that they conflict with evidence Marias discovered on the Internet. Doc. 82-2.

Plaintiffs also move to certify their class. Doc. 69. They define that class as anyone who filed a claim with State Farm under a policy issued to a Kansas resident and who "received compensation for the total loss of a covered vehicle, where that compensation was based on an appraisal report prepared by Audatex and the actual cash value was decreased based upon typical negotiation adjustments . . . to the comparable vehicles used to determine actual cash value" between December 6, 2016, and the date that the class is certified. *Id.* at 11. State Farm opposes Plaintiffs' request, primarily arguing that Plaintiffs failed to show that common issues predominate over individualized inquiries. Doc. 102.

Finally, State Farm moves for summary judgment. Doc. 77. It argues that Plaintiffs have not produced admissible evidence showing that State Farm breached its policy or that State Farm caused any injuries. Doc. 78 at 15. It also argues that Plaintiffs lack standing to pursue

their declaratory action and that their claim for declaratory relief is duplicative to their breach claim. *Id.* at 24.

## II

All told, there are seven pending motions. They are considered in the following order. Section II.A deals with the parties' motions related to expert testimony, Docs. 67, 73, 82, 84, and 126, some of which are granted, and some denied. Section II.B then addresses Plaintiffs' motion for class certification, Doc. 69, granting the motion for Plaintiffs' breach claim and denying as to their request for declaratory relief. Finally, Section II.C denies State Farm's motion for summary judgment, Doc. 77, because State Farm has not shown that it is entitled to judgment as a matter of law.

### A

The parties have filed five motions to exclude or strike expert testimony. State Farm moves to exclude two of Plaintiffs' experts, Jason Merritt, Doc. 67, and Kirk Felix, Doc. 73. It also moves to strike Merritt's second rebuttal report. Doc. 126. Plaintiffs move to exclude two of State Farm's experts, Laurentius Marias, Doc. 82, and Philip Fernbach, Doc. 84. Each motion is explored more fully below.[3]

#### 1

Plaintiffs plan to present expert testimony from Jason Merritt. Doc. 68 at 6. His testimony can be summarized as two opinions. Merritt's first opinion is that Audatex's typical negotiation adjustment conflicts with typical appraisal standards. Doc. 71-1 at 5. His second opinion is that Audatex's methodology, absent the typical negotiation adjustment, produces a sound estimate of a vehicle's actual cash value. *Id.* at 8. According to Merritt, a vehicle's actual cash value may be

---

[3] Trial courts have discretion to determine how to perform their Rule 702 gatekeeping duty. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019). And while a *Daubert* hearing is the most common method for fulfilling that function, it is not required. *United States v. Mathews*, 928 F.3d 968, 979 (10th Cir. 2019). Because neither party sought such a hearing and given the fulsome record provided, including deposition testimony, expert reports, and the parties' submissions on the matters, there is sufficient evidence to resolve the parties' motions without holding a *Daubert* hearing.

determined by using Audatex's calculation and only removing the typical negotiation adjustment that Audatex applies. *Id.* at 8–9.

State Farm moves to exclude Merritt's testimony. Doc. 67. It argues that Merritt is unqualified—*i.e.*, his opinions fall outside his specialty and experience—and that his opinions are unreliable. Doc. 68 at 6. Plaintiffs, as the proponents of Merritt's testimony, bear the burden of establishing its admissibility by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). They have done so here, and, as a result, State Farm's motion to exclude is denied.

a

State Farm first argues that Merritt is not qualified. Doc. 68 at 10. To qualify as an expert, a witness must "possess skill, experience, or knowledge in the 'particular field'" or the field must "fall 'within the reasonable confines' of [the witness's] expertise." *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013) (citations omitted).

Contrary to State Farm's position, Merritt is qualified to offer both of his opinions regarding Audatex's application of a typical negotiation adjustment. Merritt has more than forty years of experience in appraising vehicles and specializes in determining a vehicle's fair market value. Doc. 71-1 at 1–2; Doc. 71-2. Based on this experience, several courts have found Merritt qualified to testify as to the typical appraisal process, whether a typical negotiation adjustment is consistent with that process, and whether a methodology like the one Audatex employs produces a sound estimate of a vehicle's actual cash value simply by removing the typical negotiation adjustment from the rest of the calculation. *See, e.g.*, *Freeman v. Progressive Direct Ins. Co.*, 733 F. Supp. 3d 463, 481–82 (D.S.C. 2024); *Jones v. Progressive Universal Ins. Co.*, No. 22-364, 2024 WL 1254352, at *10 (E.D. Wis. Mar. 25, 2024); *Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 20-02482, 2023 WL 7213796, at *5–6 (W.D. Tenn. Aug. 25, 2023); *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 WL 5181596, at *6 (E.D. Pa. Aug. 11, 2023).

State Farm contends that Merritt should be excluded like the expert in *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001). Doc. 68 at 10–11. The expert in that case was disqualified because she did not have any expertise related to the specific issue about which she intended to testify: the adequacy of a warning regarding intramedullary nailing, a specific medical technique that involves inserting a nail into a bone to treat injuries. *Ralston*, 275 F.3d at 969–70.

9

Unlike Merritt's specific experience with car appraisals, the expert in *Ralston* was not an expert in warnings about surgical techniques or products, admitted that she had never researched the product or technique at issue, and disclaimed being an expert in intramedullary nailing. *Id.* That expert even testified that "she had never drafted, nor ha[d] ever been asked to draft, a surgical technique or warning of a product of any kind." *Id.* at 969. As a result, the expert's general expertise as an orthopedic surgeon was not specific enough to the matters she would address as an expert witness. *Id.* at 970.

That Merritt is not familiar with each aspect of the Audatex methodology does not disqualify him from testifying as an expert. *Contra* Doc. 68 at 11–12 (arguing that Merritt is not qualified because he has no knowledge of the specific matter he will address—the Audatex methodology). Firsthand knowledge or experience of the type that Merritt lacks is not required and, if anything, goes to the weight of his testimony and not its admissibility. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). Again, Merritt has decades of experience appraising vehicles to determine their fair market value. *See* Doc. 71-1 at 1–2. Merritt is "stay[ing] within the reasonable confines of his subject area" and not providing "opinions on an entirely different field or discipline." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991). Merritt has the experience, training, and knowledge to offer an opinion on the standard appraisal methodology, whether Audatex's typical negotiation adjustment deviates from it, and whether Audatex's methodology produces a sound estimate of a vehicle's actual cash value when that typical negotiation adjustment is removed. *See Freeman*, 733 F. Supp. 3d at 481–82 (holding that Merritt is qualified to opine on these same topics regarding a similar methodology to Audatex).

### b

State Farm also argues that Merritt's opinions are unreliable. Doc. 68 at 12. Testimony is reliable if it is based on sufficient facts and data, is the product of reliable principles and methods, and is the result of the expert reliably applying the principles and methods to the facts of the case. *See Roe v. FCA US LLC*, 42 F.4th 1175, 1180–81 (10th Cir. 2022) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *see also* Fed. R. Evid. 702(b)–(d).

First, consider the facts and data on which Merritt's testimony is based. Rule 703 states that "[a]n expert may base an opinion on facts

or data in the case that the expert has been made aware of or personally observed." State Farm argues that Merritt does not identify what industry standard he relies on to conclude that Audatex's methodology conflicts with typical appraisal standards. Doc. 68 at 12–13. But Merritt's testimony is based on his knowledge, skill, and training derived from four decades of appraising vehicles to determine their fair market value. *See* Doc. 71-1 at 2–3. Merritt explains in his report what he considers the standard industry practice: the comparable, or "comp," methodology that he uses to determine a used vehicle's fair market value. *Id.* at 3–5. He walks through the common procedure to calculate a vehicle's fair market value. *Id.* at 4–5. That methodology first compares the vehicle to similar ones that were recently sold within the relevant geographic area. *Id.* at 4. It then adjusts the comparable vehicles' values based on certain accepted standards like the vehicle's mileage and condition. *Id.* at 4–5.

Despite Merritt's knowledge of used-vehicle appraisals, State Farm contends that Merritt is not sufficiently familiar with Audatex's methodology to opine on its adequacy. Doc. 68 at 14–15. Merritt arrived at his conclusion after reviewing a Market-Driven Valuation Report that Audatex created and a "white paper" that Audatex prepared to explain the methodology it used to calculate a used vehicle's actual cash value. Doc. 71-1 at 4. Merritt properly based his opinion on the facts of the case—Audatex's methodology—and the industry standards that he has learned through his appraisal experience. *See Ingersoll-Rand*, 214 F.3d at 1243–44 (finding the district court did not abuse its discretion in admitting expert's testimony where expert testified based on review of deposition and discovery material); *Costello*, 2024 WL 239849, at *7–8 (explaining that Merritt reliably based his opinion on a similar program's valuation report and deposition testimony). His lack of knowledge about Audatex's specific calculations goes to the weight, not the admissibility of his testimony. *Ingersoll-Rand*, 214 F.3d at 1244. The issues State Farm identifies might convince a jury to discount Merritt's opinion, but they are not a basis to exclude his opinion entirely. *See id.* at 1247.

Second, Merritt used reliable methods to evaluate the typical negotiation adjustment and to reach conclusions based on the facts in the record. Reliability concerns the methodology employed by the expert in reaching his conclusions rather than the substance of the conclusions themselves. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (citing *Daubert*, 509 U.S. at 595). Merritt's opinions are based

on his training, experience, and certifications relating to used vehicle appraisals, the standard comp methodology, and case-specific information. Doc. 71-1 at 2–5. Merritt applied standard appraisal principles to the facts of the case and arrived at conclusions which logically follow from that data. *See id.* at 5–9. For example, Merritt notes that "[w]hen adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles." *Id.* at 4. Then, he reviewed Audatex's report to conclude that other than applying the typical negotiation adjustment, "Audatex followed customary condition-adjustment standards." *Id.* at 5. This, Merritt concludes, shows that the typical negotiation adjustment deviates from industry custom, but removing the typical negotiation adjustment from the calculation produces a sound calculation of the vehicle's actual cash value. *Id.* at 5–9. That is sufficient to establish reliability. Fed. R. Evid. 702 advisory committee's note (2023); *Bitler*, 400 F.3d at 1235 (holding that a fire investigator's expert opinion on the cause of a fire was reliable when it was based on his experience, knowledge, deductive reasoning, and observations of physical evidence at the scene because that method was generally acceptable in the field).

State Farm's attempts to undermine this result are unpersuasive. State Farm first argues that Merritt's opinion contradicts the Kansas Supreme Court's definition of fair market value, which is "the price that a willing seller and a willing buyer would agree upon in an arm's length-transaction." Doc. 68 at 15 (quoting *State v. Hall*, 304 P.3d 677, 681 (Kan. 2013)). But the Kansas Supreme Court's definition of fair market value is consistent with Merritt's opinion: "that advertised price is the starting point for determining [actual cash value] and adjustments must be supported by 'a specific reason, grounded in evidence.'" *See* Doc. 90 at 16. Under Merritt's theory, the appropriate adjustments to the advertised price will result in a calculation that meets "the price that a willing seller and a willing buyer would agree upon in an arm's length-transaction." *Hall*, 304 P.3d at 681.

State Farm then argues that Merritt's opinions are unreliable because they are not testable. Doc. 68 at 16. Experts who testify based on personal knowledge and experience often use methods that are "not susceptible to testing or peer review." *Bitler*, 400 F.3d at 1235. Merritt has described how the comp methodology he relied on to reach his conclusions comports with generally acceptable practices of used

vehicle appraisers, making his opinions sufficiently reliable. *Id.*; *Kumbo Tire*, 526 U.S. at 151.

Finally, State Farm contends that Merritt's opinions are unreliable because he is not "being as careful as he would be in his regular professional work outside his paid litigation consulting." Doc. 68 at 18; Fed. R. Evid. 702 advisory committee note (2000) (quoting *Sheehan v. Daily Racing Farm, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)). This is because, according to State Farm, he did not independently appraise each vehicle using the comp methodology he described. Doc. 68 at 16. That argument misses the mark. Merritt's opinion is that Audatex already applied a methodology consistent with the one Merritt promotes but thereafter deviated from industry norms by artificially reducing or discounting that amount through the something it calls the typical negotiation adjustment. Doc. 71-1 at 4–5. This is "the same level of intellectual rigor that characterizes the practice of an expert in [Merritt's] field." *Kumbo Tire Co.*, 526 U.S. at 152.

## 2

In addition to Merritt's initial report, he created two reports rebutting the opinions of State Farm's experts. Docs. 86 & 124-2. The parties agree that Plaintiffs were required to disclose rebuttal expert reports on or before May 13, 2024. Doc. 126 at 2–3. Plaintiffs filled Merritt's second rebuttal report on June 21, 2024, as an attachment to their reply brief regarding their motion for class certification. Doc. 124-2. Accordingly, State Farm moves to strike Merritt's second rebuttal report as a sanction for Plaintiffs' untimely disclosure. Doc. 126. Merritt's second rebuttal report was not necessary to decide the motion that it accompanied: Plaintiffs' motion for class certification, Doc. 124. As a result, the only remaining issue is whether Merritt may testify at trial about the opinions contained in his second rebuttal report. *See Renewable Fuels Ass'n v. U.S. Env't Prot. Agency*, 948 F.3d 1206, 1257–58 (10th Cir. 2020), *rev'd on other grounds sub nom. HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382 (2011) (denying motions that were not necessary for the opinion as moot).

Plaintiffs violated Rule 26(a) by untimely disclosing Merritt's second rebuttal report, making it necessary to consider State Farm's request for Rule 37 sanctions. Rule 37 bars a party from using information it failed to disclose as required by Fed. R. Civ. P. 26(a) "unless the failure was substantially justified or is harmless." *See Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1226 (10th Cir. 2015) (discussing a

court's Rule 37(c) authority). Four factors guide a court examining whether failure to disclose was substantially justified or is harmless: the degree of prejudice or surprise to the opposing party, the ability to cure the prejudice, the extent to which allowing the late disclosure would disrupt trial, and the offending party's "bad faith or willfulness." *HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200 (10th Cir. 2017); *see also Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). Each factor weighs in Plaintiffs' favor, so State Farm's motion is denied.

The first two factors weigh in Plaintiffs' favor because State Farm may easily cure any prejudice caused by the delay. State Farm's arguments primarily focus on the prejudice that the untimely report would cause if the opinions in the report were considered as part of Plaintiffs' arguments in support of their motion for class certification. Doc. 126 at 5. For example, State Farm explained that it could not conduct discovery regarding Merritt's newly disclosed opinions or file a motion to exclude those opinions because Plaintiffs filed the motion on the day that discovery closed and after expert challenges were due. *Id.* Those arguments may have supported State Farm's argument to strike Merritt's second rebuttal expert for purposes of class certification, but they are insufficient to show that allowing Merritt to testify about those opinions at trial will cause uncurable prejudice to State Farm. As Plaintiffs note, the discovery and expert disclosure deadlines set forth in the parties' scheduling orders applied only to discovery related to Plaintiffs' ability to certify a class. Doc. 135 at 3; Doc. 44 at 2 (setting discovery deadlines for "[c]lass certification expert discovery"). The scheduling order contemplates a second phase of discovery for issues related to the case's merits. Doc. 44 at 2 (advising parties that the Phase II scheduling order will be set after a ruling on Plaintiffs' class-certification motion). State Farm will have the opportunity to conduct discovery and file motions to exclude expert testimony during that phase, curing any potential prejudice. *Woodworker's Supply*, 170 F.3d at 993 (explaining that a "significant opportunity to cure" prejudice caused by late disclosure weighs against excluding the evidence entirely); *Gillum v. United States*, 309 F. App'x 267, 270 (10th Cir. 2009) (finding that the opportunity to depose an expert a second time sufficiently cured any prejudice caused by the delay).

The final two factors also support admitting Merritt's second rebuttal report. No trial has been set in this case, so allowing Plaintiffs' untimely disclosure will not impact or delay trial. *Stewart v. United Parcel*

*Serv., Inc.*, No. 20-2461, 2023 WL 143229, at *6 (D. Kan. Jan. 10, 2023) (finding that a party's late supplemental expert disclosure did not disrupt trial when the trial was nine months away); *Stovall v. Brykan Legends, LLC*, No. 17-2412, 2019 WL 1014731, at *4 (D. Kan. Mar. 4, 2019) (finding that a trial seven months away would not be disrupted where curing the prejudice would not require reopening discovery). And there is no evidence that Plaintiffs violated Rule 26(a) willfully or in bad faith. Plaintiffs contend that they failed to timely disclose Merritt's second rebuttal report because the report addressed arguments that State Farm made for the first time in its response to Plaintiffs' motion to certify a class. Doc. 135 at 1–3. According to Plaintiffs, they could not have anticipated these new arguments until State Farm raised them in its response. *Id.* So, Plaintiffs attached the second rebuttal report to their reply, which was due on the last day of discovery. Even if State Farm is correct that Plaintiffs' surprise was unreasonable, *see* Doc. 126 at 6, State Farm has not pointed to anything that suggests bad faith or willfulness. *See Nalder v. West Park Hosp.*, 254 F.3d 1168, 1178–79 (10th Cir. 2001) (finding no bad faith even though the party that disclosed the expert "could—and probably should—have done a better job providing the basis for" the expert's opinion). As a result, striking Merritt's second rebuttal report is not appropriate.

### 3

State Farm also moves to exclude testimony from Plaintiffs' expert, Kirk Felix. Doc. 73. Felix intends to opine that "vehicles are priced to market and used car dealers do not deviate down from the advertised cash price with limited exceptions that are not related to the market value of the car." Doc. 75-1 at 4. State Farm contends that Felix is unqualified to testify about this topic and that his opinions are unreliable. Doc. 74. Plaintiffs have again met their burden to establish the admissibility of this expert testimony by a preponderance of the evidence. *See Nacchio*, 555 F.3d at 1241.

### a

Consider Felix's qualifications first. He earned a Bachelor of Science in Business from the University of Colorado Denver in 1986. Doc. 75-1 at 16. For more than two decades, he was a moderator and consultant at an agency where he ran a program that organized groups of car dealerships that would meet to "discuss industry trends and best practices for operating efficient, profitable dealerships." *Id.* at 2. His duties included reviewing dealerships' financial performance like the

dealerships' "volume, sales amounts, gross profit, expenses, and net profit." *Id.* at 3. He worked with over three hundred car dealerships during his time running that program. *Id.* Several courts have held that Felix's experience qualifies him to testify as to the relationship between a used vehicle's actual cash value and its advertised price in the moder used-vehicle market. *Freeman*, 2024 WL 2044782, at *4–5; *Jones*, 2024 WL 1254352, at *4; *Costello v. Mountain Laurel Assurance Co.*, No. 22-35, 2024 WL 239849, at *11 (E.D. Tenn. Jan. 22, 2024); *Brown v. Progressive Mountain Ins. Co.*, No. 21-175, 2023 WL 9193005, at *4 (N.D. Ga. Sept. 20, 2023); *Clippinger*, 2023 WL 7213796, at *5; *Drummond*, 2023 WL 5181596, at *6.

Felix's personal knowledge qualifies him to opine on the used-vehicle market, how it has evolved with market trends, and whether dealers tend to deviate from the advertised cash price. Felix's opinions directly relate to his experience consulting with car dealerships, discussing industry trends, and reviewing data related to those trends. *See* Doc. 75-1 at 3–4. State Farm's concern that Felix has not personally appraised or sold used cars goes to the weight of his testimony, not its admissibility. *Ingersoll-Rand*, 214 F.3d at 1244. Plaintiffs state that Felix does not intend to testify about Audatex's methodology or how it should be adjusted to properly value a used vehicle.[4] Doc. 89 at 19 n.8. But regarding the opinions that Plaintiffs say Felix will address, Felix is "stay[ing] within the reasonable confines of his subject area" and not providing "opinions on an entirely different field or discipline." *Wheeler*, 935 F.2d at 1100.

### b

State Farm then challenges Felix's opinions as unreliable. Doc. 74 at 10. In essence, State Farm argues that Felix's opinion is unreliable because it is based solely on his experience and cannot be testified through scientific methods. *Id.* at 16–19. This, according to State Farm,

---

[4] Although Plaintiffs state that Felix does not intend to testify about the specifics of Audatex's methodology, Felix's report contains a section that discusses Audatex's methodology in depth. See Doc. 75-1 at 6–7. To the extent that Felix intends to testify about such matters, he has not shown the requisite qualifications to do so. *See, e.g., Brown*, 2023 WL 9193005, at *4–5; *Costello*, 2024 WL 239849, at *11 (finding Felix unqualified to testify about specific methodologies that apply a typical negotiation adjustment).

deprives State Farm of the ability to test the accuracy of Felix's opinions. *Id.*

State Farm's argument fails for at least two reasons. First, Felix's opinions are based on reliable facts and data. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). He bases these opinions on the knowledge and experience he gained from decades of consulting with dealerships selling used vehicles. Doc. 75-1 at 2–3. That experience taught Felix how dealerships price used vehicles, how their processes have evolved over decades, why vehicles sometimes sell for less than their advertised price, and how dealerships have changed how they price a used vehicle based on the Internet and other factors. *Id.*

Moreover, Felix explained how he formed his opinions. He consulted with dealerships to discuss industry trends and best practices, analyzed the financial performance of dealerships across the United States, and reviewed financial records of dealerships monthly. *Id.* This gave Felix sufficient facts and data on which he could rely to opine on market trends and dealership's pricing decisions. *See, e.g., Costello,* 2024 WL 239849, at *10 (holding that Felix sufficiently relied on his extensive experience to opine that generally "vehicles are priced to market and used car dealers do not deviate down from the advertised cash price, with limited exceptions").

Second, Felix used reliable methods to evaluate the data he gathered through his experience and reach conclusions based on it. That is hardly remarkable. *Kumho Tire Co,* 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Felix applied what he knows about the automotive industry to arrive at conclusions that logically follow from that knowledge and experience. Fed. R. Evid. 702 advisory committee's note (2023); *Tudor v. Se. Okla. State Univ.,* 13 F.4th 1019, 1030–31 (10th Cir. 2021) (explaining that an expert may testify about opinions that rely on subjective opinions supported by general standards in the expert's field). For example, Felix explained that when he met with representatives from car dealerships, they discussed how dealerships expected consumers in the Internet age to compare different dealerships' advertised prices for used vehicles and make decisions based on those list prices. Doc. 75-1 at 2–3. They would also discuss how to improve financial performance and maximize each dealership's profits in light of the new, transparent used-vehicle market brought on

by the Internet. *Id.* at 3. Then, he reviewed case-specific data from Audatex showing the ratio of vehicles sold below, above, or at the vehicle's advertised price. *Id.* at 13. And he concluded that instances in which vehicles sold for below their listed price were attributable to reasons other than the vehicle's actual cash value. *Id.* at 7–8, 13. This is sufficient to establish reliability. *Bitler*, 400 F.3d at 1235 (finding expert conclusions based on experience and knowledge reliable because that method was generally acceptable in the field); *Clippinger*, 2023 WL 7213796, at *5 (W.D. Tenn. Aug. 25, 2023) (finding Felix adequately detailed how he applied his personal knowledge and experience to form his opinions on the used car market).

### 4

Like Plaintiffs, State Farm intends to introduce expert testimony at trial. State Farm's first expert, M. Laurentius Marais, Ph.D., is an Executive Vice President at a consulting firm where he specializes in "applied mathematical and statistical analysis." Doc. 82-2 at ¶ 1. Marais intends to testify as a rebuttal expert to two of Plaintiffs' experts: Kirk Felix, whose opinions were described above, and Dr. Phillip Johnson, Plaintiffs' damages expert. Doc. 82-2.

Marais's testimony can be summarized as two opinions. First, he opines that "Felix provides *no* testable, auditable, or replicable basis for the subjective impressions he offers as expert opinions in this matter—his opinions are *intrinsically* unscientific." Doc. 82-2 at 4 (emphasis in original). Second, he opines that Johnson does not provide a valid basis for his claim that Audatex's typical negotiation adjustment is based on incorrect data. *Id.* at 13. Plaintiffs do not seek to exclude Marais entirely, but they challenge four portions of his report. Doc. 82 at 7, 9, 11, 14. Each is addressed in turn.

**1.** Plaintiffs first challenge Marais's opinion that Plaintiff's expert—Kirk Felix—did not rely on empirical evidence. Doc. 82 at 7. In particular, Plaintiffs contend that Marais is unqualified to testify about the methods that Felix used to form his opinions. *Id.* at 7 (citing Doc. 82-2 at 5). They also say that Marais's opinion encroaches on the jury's role to evaluate the weight and credibility of evidence, as well as the court's gatekeeping role to determine the admissibility of an expert's position. *Id.* at 8–9. Plaintiffs' position is sound.

Marais's opinions are not tied to his expertise in applied statistics and mathematics. A rebuttal expert need not have the same

qualifications as the expert that he or she rebuts, but the rebuttal expert still must testify about a subject matter that is "within the reasonable confines" of the expert's subject area. *Ralston*, 275 F.3d at 970. The opinions that Marais criticizes derive from Felix's decades of experience as a consultant in the automotive industry. *See supra* Part 2.A.2. Marais's criticism of Felix's opinions largely mirrors the arguments that State Farm made in its challenge to the admissibility of Felix's opinions. *Compare* Doc. 82-2 at 5–6 (Marais report criticizing Felix's opinions as relying solely on his experience and subjective impressions), *with* Doc. 74 (State Farm's brief arguing to exclude Felix's testimony because he relies only on his consulting experience and not on empirical data). As previously explained, Felix's opinions meet Rule 702's foundational requirements for admissibility even though he did not rely on empirical evidence like statistical data to form them because he relied on principles generally accepted in his field. *Kumho Tire Co.*, 526 U.S. at 156.

Not only is Marais unqualified to offer this opinion, but the opinion encroaches on the jury's role and is unhelpful. *See United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (explaining that testimony about uncomplicated topics "would have added nothing to the trial that a juror could not understand on the basis of common sense"). State Farm says it does not intend to introduce Marais's opinion as a way to persuade the jury to afford less weight to Felix's testimony because it lacks empirical support. Doc. 108 at 5. But Felix is qualified to testify based on his experience, so it is unclear how Marais's opinions are relevant or helpful to the jury other than to suggest that Felix's opinions are not credible. *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342–43 (10th Cir. 2017) (collecting cases that stand for the principle that an "expert witness cannot state legal conclusions by . . . passing upon weight or credibility of the evidence"). Marais may well have the qualifications to rebut an expert's opinion that is rooted in statistics or mathematics. That is insufficient to qualify him to rebut an opinion that involves neither of those two subject matters. *Bill Barrett Corp.*, 918 F.3d at 772 (finding arguments about the expert's qualifications and expertise in a certain field insufficient to establish that an expert's testimony would be helpful to the jury in determining an ultimate fact at issue); *Nacchio*, 555 F.3d at 1258 (explaining that an expert may have extensive credentials that may qualify the expert to testify in other cases but that the *Daubert* inquiry must focus on the specific testimony in the particular case).

**2.** Plaintiffs next challenge Marais's opinion that online articles contradict Felix's opinion that a used vehicle's advertised price reflects its actual cash value. Doc. 83 at 9 (citing Doc. 82-2 at 10). Specifically, Marais conducted an Internet search in which he found articles suggesting that dealerships regularly engage in price negotiation with used-vehicle buyers. Doc. 82-2 at 10. Marais says that these "published articles and other pertinent literature demonstrates that writings in and about the industry do not comport with Mr. Felix's opinion that all dealers are now effectively 'no haggle' dealers." *Id.* Plaintiffs contend that Marais is unqualified to offer this opinion and that he improperly relied on inadmissible hearsay to reach his conclusion. *Id.* at 9–11. In sum, they say that Marais is merely "parrot[ing] the hearsay articles he found on the internet" in a way that offers no expertise of his own to help the jury understand the evidence. *Id.* at 11.

Rule 702 allows an expert to be excluded if the expert "would act as [a] mere conduit[] for hearsay." *Williams v. Illinois*, 567 U.S. 50, 80 (2012) (citing Fed. R. Evid. 702(a)). That does not mean any expert who relies on hearsay must be excluded. Rule 703 allows experts to rely on evidence that would otherwise be inadmissible "so long as experts in their field would reasonably rely on that kind of data." *Hafen v. Howell*, 121 F.4th 1191, 1202 (10th Cir. 2024). According to State Farm, "Dr. Marais did what statisticians and economists routinely do—survey publicly available information and draw empirical conclusions based on that data." Doc. 108 at 7. In particular, he used Factiva, which State Farm says is "a platform routinely used by experts to analyze media." *Id.* Marais compiled articles based on key terms like "used," "previously owned," "negotiate," and "haggle," and found several articles that address price negotiation at used-car dealerships. Doc. 82-2 at ¶ 18 n.24. He seeks to use the existence of these articles to opine "that price negotiation at traditional dealerships is not extinct," contrary to Felix's opinion. *Id.* at ¶ 18.

State Farm has not met its burden to show that an expert in Marais's field would reasonably rely on the Factiva search Marais undertook. Like the first opinion Plaintiffs challenged, he does not rely on his statistical or mathematical expertise to offer his opinion. *See Nacchio*, 555 F.3d at 1258 (reiterating that an expert's credentials must be specific to the case at hand). State Farm's argument assumes that any statistician would be qualified to relay an opinion to a jury based on any article he or she happened to find as the result of an internet search. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1125 (10th Cir. 2006)

20

(declining to allow an expert to testify where the proponent of the evidence did not meet his burden to show that the expert's opinions satisfied the applicable standard).

The authority State Farm cited does not support such a broad reading of Rule 703. Consider the first case State Farm relies on, *Innovation Ventures, L.L.C. v. Custom Nutrition Lab'ys, L.L.C.*, 520 F. Supp. 3d 872, 892 (E.D. Mich. Feb. 16, 2021). In that case, an economics and business expert reasonably relied on news articles about an investigation that the Food and Drug Administration conducted. *Id.* The expert used the article to opine about whether the existence of the FDA investigation impacted consumer behavior and preferences for the product. *Id.* In other words, a business expert reasonably relied on an article about situations that would impact consumer behavior and, consequently, businesses' profitability. *See id.* That holding does not support the conclusion that an economics or business expert would be qualified to opine on any subject supported by a news article simply because those experts may reasonably rely on news articles about certain topics. *Nacchio*, 555 F.3d at 1258 (reiterating that the *Daubert* analysis is case specific).

State Farm also points to *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 438–39 (E.D.N.Y. 2013). Doc. 108 at 8. In that case, experts on terrorism organizations reasonably relied on news reports, academic materials, and hearsay about terrorism activities. *Id.* The experts testified about how experts in their field reasonably rely on the type of material they used. *Id.* And they further explained the unique need that terrorism experts have to rely on external material and sources: "Terrorist organizations necessarily are secretive and dangerous, and there may be political reasons against meeting with reputed terrorists." *Id.* at 439. By contrast, State Farm has offered no support for Marais's reliance on the news article other than that statisticians often use Factiva to survey online data.

Finally, State Farm relies on *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. 2024). Doc. 108 at 8. Like Marais, the marketing expert in that case relied on news stories that she found on Factiva and similar platforms. *McIntire*, 38 F. Supp. 3d at 429. But she was not qualified to do so simply because experts in fields like marketing may reasonably rely on *any* article they find on Factiva. Instead, the expert specifically intended to testify about how the news stories she discovered impacted certain stock prices. *Id.* Marais has not shown how a statistics or mathematics expert would reasonably rely

on any article that his Factiva search generated to opine on subject matters unrelated to statistics or mathematics.

State Farm asserts that Plaintiffs attempt to "have it both ways" and "insulate their unsupported expert evidence from criticism." Doc. 108 at 10. Not so. State Farm could have offered a qualified expert to rebut Felix's testimony about the used-vehicle market. And it may also challenge how much weight a jury should give to Felix's testimony through the adversarial process. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). But State Farm's disagreement with Felix's opinions is insufficient to entitle it to rebut those opinions with testimony that fails to meet Rule 702's foundational requirements. *See Rodriguez-Felix*, 450 F.3d at 1125.

**3.** Plaintiffs then challenge Marais's opinion rebutting Plaintiffs' damages expert's opinion that Audatex's methodology—absent the typical negotiation adjustment—provides an appropriate calculation of each class member's damages. Doc. 82 at 11 (citing Doc. 82-2 at ¶ 41). Marais points out that State Farm could have calculated the actual cash value of Plaintiffs' vehicles in a way that did not use a typical negotiation adjustment. Doc. 82-2 at ¶ 41. Because of that, he opines that Plaintiffs' damages expert failed to consider the possibility that another valid methodology could amount to even less than the amount that Audatex calculated. *Id.* Plaintiffs contend that Marais is merely speculating that State Farm could have used something other than Audatex's methodology to calculate each vehicle's actual cash value, suggesting nothing more than "a layman's observation that this other vendor exists." Doc. 82 at 12.

Plaintiffs' argument fails. Marais has the requisite qualifications to criticize Johnson's damages model. *See* Doc. 82-2 at 2 (explaining Marais's expertise in "the use of mathematical and statistical methods for the analysis of damages"). Under Johnson's model, each class member's damages will amount to the exact difference between Audatex's calculation and Audatex's calculation with the typical negotiation adjustment removed. Doc. 82-2 at ¶ 41. Marais—an expert in applied statistics and mathematics—argues that Johnson's model fails to consider all the factors that could impact the actual cash value of a used vehicle and that it improperly assumes that removing one factor would leave the rest of a methodology intact. *Id.* He reached this conclusion by independently reviewing State Farm's statistical data and calculating

the difference between a similar vendor that does not use a negotiation adjustment and Audatex's calculation that applied that adjustment. *Id.* He then explained that his calculations showed that an alternate vendor that did not apply a typical negotiation adjustment produced lower appraisal values than Audatex's method. *Id.* And he opines that, in Plaintiffs' case, alternate vendors show that the actual cash value of their vehicles is even lower than what Audatex calculated. *Id.* at ¶ 42. Plaintiffs' criticism of Marais's opinion goes to the weight of Marais's opinion and not its admissibility. *Smith*, 214 F.3d at 1244 (citing *Daubert*, 509 U.S. at 592).

**4.** Finally, Plaintiffs challenge Marais's opinions on what the named Plaintiffs' damages should be. Doc. 82 at 14–15 (citing Doc. 82-2 at ¶¶ 42–44). In his report, Marais states the amount that State Farm paid each Plaintiff based on Audatex's report. Doc. 82-2 at ¶¶ 42–44. Next, he states what Plaintiffs' expert Johnson opines each Plaintiff's damages are. *Id.* Then, he states what State Farm's expert—Megan O'Rourke—determined each vehicle's actual cash value was based on her appraisal. *Id.* Marais then opines that Johnson's calculations fail to address the "vital question of whether State Farm's valuation and the resulting payout" amounted to the vehicle's actual cash value. *Id.* at ¶ 42. Marais's opinion appears to accept that O'Rourke's calculation is the correct one, leading him to opine that Plaintiffs are entitled to no damages or less damages than Johnson's model calculates. *Id.* at ¶¶ 42–44.

Marais may have relied on applied statistics or mathematics to reach this conclusion. But nowhere does he explain or even articulate the methodology on which he relied. *See Bill Barrett Corp.*, 918 F.3d at 772 (explaining that an expert must specify the methodology used to develop an opinion). Marais simply repeated three different options for what the vehicles' actual cash value could be, assumed one was correct, and did basic subtraction to conclude that Plaintiffs are not entitled to any damages. *See* Doc. 82-2 at ¶¶ 42–44. Marais is not offering "substantive criticism based on his expertise as an economist to the damages model that [Johnson] provides. Instead, he opines on what he believes the legally appropriate measure of damages should be." *Ngethpharat v. State Farm Fire & Casualty Co.*, 2021 WL 2823245, at *3 (W.D. Wash. July 7, 2021) (excluding Marais's opinion for the same reason). He cannot do that. *See Bill Barrett Corp.*, 918 F.3d at 771 (finding that "any testimony drawing legal conclusions would not help the jury determine a fact in issue and therefore would not be relevant").

**5**

State Farm also plans to introduce the testimony of Philip Fern-
bach. Doc. 84 at 4. Fernbach is "an expert on consumer research, cog-
nitive science, research methods and data analytics." Doc. 84-2 at 2.
Fernbach intends to rebut Felix's opinion that a used vehicle's adver-
tised price reflects its fair market value. *Id.* at 5. To do this, Fernbach
conducted two surveys—one of car buyers and one of sellers—"to as-
sess the prevalence of price negotiation in the used car market and the
prevalence of buyers paying below the advertised price." *Id.* He con-
cluded, based on those surveys, that "[b]oth used-car buyers and used-
car sellers reported that price negotiation was common and that buyers
commonly paid below the advertised price for used cars in Kansas and
neighboring states" during the relevant time period. *Id.* To conduct
these surveys, Fernbach used the third-party research service Qualtrics
to recruit participants and to scrub and clean the data. *Id.* at 9.

Plaintiffs move to exclude Fernbach's testimony and the survey
results on which it is based. Doc. 84. They argue that the surveys are
inadmissible hearsay, and that they do not have a fair opportunity to
cross-examine the participants of the surveys because State Farm will
not disclose the identities of the survey participants. *Id.* at 8–9. Accord-
ing to Plaintiffs, Fernbach's testimony and the survey evidence must
be analyzed under the residual hearsay exception, Fed. R. Evid. 807,
because the survey data represents hearsay that does not meet any ex-
ception to be admissible. *Id.* at 11–12.

The admissibility of Fernbach's testimony and the survey evidence
is governed by Fed. R. Evid. 703, not the residual hearsay exception.
Rule 703 permits experts to base an opinion on inadmissible evi-
dence—including hearsay—so long as an expert "in the particular field
would reasonably rely on those kinds of facts or data." It also allows
the underlying information forming the opinion to be admitted if the
probative value in helping the jury evaluate the expert's opinion sub-
stantially outweighs its prejudicial effect. *Id.*

Fernbach's testimony meets Rule 703's requirements. State Farm
argues that Fernbach reasonably relied on the survey results to form
his opinions because "survey researchers, such as Dr. Fernbach, rea-
sonably rely on surveys in forming opinions." Doc. 106 at 6. Fernbach
also stated in an affidavit that experts in his field "rely on survey data
to form their opinions." Doc. 106-2 at ¶ 2. Plaintiffs do not rebut that
experts in consumer research and data analytics reasonably rely on

survey data to form opinions. *See Black v. M & W Gear Co.*, 269 F.3d 1220, 1229 (10th Cir. 2001) (assuming the data was of the type experts would rely on where the opponent of the evidence did not argue otherwise). But they assert that Fernbach does not add anything to the inadmissible evidence and simply is being used as a portal to admit it. Doc. 123 at 4–5. This is unpersuasive. Fernbach uses his expertise in summarizing, analyzing, and explaining survey data to opine that during the relevant time frame, "negotiation over the price of used cars at dealerships in Kansas and neighboring states was common and occurred the majority of the time" and that most of the time, "buyers of used cars at dealerships in Kansas and neighboring states commonly paid below the advertised price." Doc. 84-2 at 8. *See United States v. McPhilomy*, 270 F.3d 1302, 1314 (10th Cir. 2001) (admitting a geologist's opinion about the value of a stone even though he relied on hearsay from retailers discussing its value).

That Fernbach's opinion is admissible does not mean the survey evidence itself is automatically admissible. *See* Fed. R. Evid. 703 advisory committee notes. But Plaintiffs do not address the standard that applies to the admissibility of survey evidence not meeting a hearsay exception when an expert relies on the evidence to form an opinion, which is to determine whether its probative value in helping the jury understand the expert's opinion substantially outweighs its prejudicial effect. *See* Fed. R. Evid. 703. As a result, Plaintiffs have not shown at this stage of the proceedings that the survey evidence should be excluded. *See Hafen*, 121 F.4th at 1202–03 (finding a hearsay challenge to an expert opinion based on inadmissible evidence insufficient to exclude the expert opinion in light of Rule 703).

\* \* \*

Most of the expert opinions in this case fall inside "the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts." *Kumho Tire Co.*, 526 U.S. at 153. This includes Plaintiffs' experts, Jason Merritt and Kirk Felix, and State Farm's expert, Philip Fernbach. It also includes Laurentius Marais's opinion that State Farm's damages model fails to account for the possibility that methodologies other than Audatex could have produced a lower estimate of a vehicle's actual cash value than Audatex's calculation. Marais's other three opinions, however, do not surpass Rule 702's minimum requirements for admissibility. As a result, Plaintiffs' motion to exclude Marais's expert opinions, Doc. 82, is granted

in part and denied in part, while the rest of the parties' expert motions, Docs. 67, 73, 84, and 126, are denied.

<b>B</b>

Plaintiffs also seek class certification on their breach claim and their claim for declaratory relief. Doc. 69. They seek to represent the following class:

> All persons who made a first-party claim on a policy of insurance issued by State Farm Mutual Automobile Insurance Company to a Kansas resident who, from December 6, 2016, through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an appraisal report prepared by Audatex and the actual cash value was decreased based upon typical negotiation adjustments . . . to the comparable vehicles used to determine actual cash value.

Doc. 69 at 11.

Plaintiffs' proposed class must meet the four Rule 23(a) prerequisites for certification—numerosity, commonality, typicality, and adequate representation. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). If the prerequisites of Rule 23(a) are met, then Plaintiffs must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* Plaintiffs invoke Rule 23(b)(3) to certify their breach claim, Doc. 69 at 20, meaning they must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). On their claim for declaratory relief, Plaintiffs seek to certify their class under Rule 23(b)(2). Doc. 69 at 34. That provision requires Plaintiffs to show that State Farm "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs' motion is granted in part and denied in part. It is granted on their breach claim because the four Rule 23(a) prerequisites for certification are satisfied, and Rule 23(b)(3)'s predominance and

26

superiority requirements are met. But it is denied regarding their declaratory action because they have not met Rule 23(b)(2)'s requirements for certification.

### 1

Plaintiffs assert that the proposed class meets Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. Doc. 69 at 18–25. The parties agree that Plaintiffs' proposed class of over 26,000 members is sufficient to make "joinder of all members … impracticable." Fed. R. Civ. P. 23(a)(1); *see also* Doc. 69 at 20. As a result, the parties only dispute the remaining three Rule 23(a) requirements: commonality, typicality, and adequate representation.

### a

Plaintiffs assert Rule 23(a)(2)'s commonality requirement is satisfied. Doc. 69 at 20. Rule 23 requires a question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To show commonality, the plaintiff must "demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (citation and internal quotation marks omitted). This means that the claims of the putative class "must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Id.* at 350. A contention is of such a nature when "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs identify two common issues that satisfy the commonality standard. The first involves the breach element of Plaintiffs' breach of contract claim. Doc. 69 at 22. Each class member must show that State Farm breached its insurance policy by applying a typical negotiation adjustment to its calculation of each vehicle's actual cash value. *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916–17 (10th Cir. 2018) (finding that a question of whether a policy was improper met Rule 23(a)'s commonality requirement because all class members based their claims on the same challenged policy). That question is common within the proposed class: Each claim advances if the typical negotiation adjustment was permissible, and each fails if it was not. *See Dukes*, 564 U.S. at 350.

The second common issue regards Plaintiffs' injuries. Plaintiffs' position is that State Farm's calculation produces a sound estimate of

a vehicle's actual cash value before the typical negotiation adjustment is applied to that calculation. Doc. 69 at 22–23. And they have produced evidence in the record supporting their position. *Id.* at 23–24 (describing expert Jason Merritt's report, Doc. 71-1). Whether that damages model accurately measures a vehicle's actual cash value is a question whose answer would resolve an essential element of each Plaintiff's claim in one stroke. *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 794 (10th Cir. 2019) (finding commonality satisfied when the plaintiffs provided evidence that damages could be determined on a class-wide basis through the use of an expert's damages model).

State Farm denies commonality. Doc. 102 at 21. But State Farm provides no colorable argument that Plaintiffs failed to identify at least one question common to all class members. *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010) ("A finding of commonality requires only a single question of law or fact common to the entire class."). Instead, State Farm's arguments are more relevant to Rule 23(b)(3)'s inquiry regarding whether the common questions predominate over individualized issues, which is more fully explored below. *See infra* Part 2.C.a; *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1193–94 (10th Cir. 2023) (explaining that the presence of some individualized inquiries uncommon to the class does not defeat commonality under Rule 23(a)(2) once a common question is identified).

### b

Plaintiffs then assert that Rule 23(a)(3) and (4)'s typicality and adequacy requirements are met. Doc. 69 at 30. State Farm does not dispute this assertion as to Gulick. It does, however, contend that Schlehuber's claims are not typical of the class she purports to represent and that she does not adequately represent that class. Doc. 102 at 41. State Farm's arguments fail.

To satisfy Rule 23(a)(3), the claims of the representative plaintiffs must be typical of the claims of the proposed class. Fed. R. Civ. P. 23(a)(3). But "the interests and claims of named plaintiffs and class members need not be identical." *Devaughn*, 594 F.3d at 1198. So long as their claims are "based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." *Id.* at 1198–99. The typicality inquiry "tend[s] to merge" with Rule 23(a)(4)'s adequacy requirement, *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013), which asks whether

28

the named plaintiffs and counsel have any conflicts of interest with other class members and will prosecute the action vigorously on behalf of the class. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1204 (10th Cir. 2006).

Schlehuber's claims—for both her Nissan and Lexus—are typical of the class she seeks to represent. Like all putative class members, State Farm used an Audatex report to calculate the actual cash value of Schlehuber's vehicles, which applied a downward typical negotiation adjustment. *See Devaughn*, 594 F.3d at 1198–99 (finding typicality where the named plaintiff's injury or risk of injury was the result of the same policies and practices of all putative class members even though each class member had different individual circumstances). In addition, Schlehuber's asserted interest is the same as all class members—the contractual right to be paid a totaled vehicle's actual cash value. And so is her alleged injury—denial of that right due to Audatex's typical negotiation adjustment. *See Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (finding a tester plaintiff's claims were typical of the class because the plaintiff possessed the same interest and suffered the same injury as all putative class members). That State Farm conducted a second appraisal of Schlehuber's Nissan does not make her claim atypical of the class she seeks to represent. *Contra* Doc. 102 at 42–43. State Farm's offer to pay Schlehuber an additional amount after she sued does not change her contention that State Farm breached its promise to pay her the actual cash value of her vehicle when it paid her an amount artificially reduced by a typical negotiation adjustment. *See Menocal*, 882 F.3d at 917 (explaining that individual factual circumstances did not defeat typicality because the legal theory was the same regardless of differences among plaintiffs).

It is the same for Schlehuber's claims regarding her Lexus. Even though Schlehuber elected to owner-retain her vehicle, repair it at a price less than what State Farm calculated, and trade it in later, State Farm still settled her total-loss claim using an amount that it calculated through Audatex's system and adjusted downward using the typical negotiation adjustment. *See* Doc. 93 at ¶ 21. Again, Schlehuber asserts the same interest and suffered the same injury as all other class members whose policies required State Farm to pay them the actual cash value of their vehicles but who were paid an amount adjusted downward based on negotiation. *See Colo. Cross Disability Coal.*, 765 F.3d at 1216.

Finally, State Farm argues that its affirmative defense regarding Schlehuber's Lexus is so unique that it defeats typicality. Doc. 102 at 45. Specifically, it says the defense will become a "major focus of the litigation," making Schlehuber atypical from the rest of the class. *Id.* It cites three nonbinding cases suggesting that unique defenses may defeat typicality if the defenses threaten to become the focus of the litigation. None are persuasive.

For example, in *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 623–24 (D. Kan. 2008), the plaintiff did not establish typicality because the class action alleged that a company used a program that misled customers, and there was evidence that the named plaintiff visited one of the company's locations that did not use the allegedly unlawful program. That is different than Schlehuber, who was subject to the same Audatex methodology as the rest of the putative class.

In *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090, 1103 (D. Utah 2023), the typicality requirement was not met because the defendant allegedly violated antitrust law by bundling two products. But 90% of the named plaintiff's purchases from the defendant company were the unbundled, standalone products. *Id.* Again, this is different from Schlehuber, who suffered the same injury—underpayment—as the rest of the putative class.

Finally, in *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 304 F.R.D. 601, 612 (D. Colo. 2015), the named plaintiff was not typical of the rest of the class because a unique defense applied to him. The case regarded confusion by customers who had not reviewed certain charges that applied to them. *Id.* But there was evidence that the named plaintiff had separately initialed the charges, meaning his confusion did not stem from his lack of reviewing the charges like it did for the rest of the class. *Id.* As a result, his claims would not necessarily prove the claims of each class member. *Id.* In contrast, Schlehuber's claim that the application of a typical negotiation adjustment artificially reduces the actual cash value of a vehicle would prove the claims of each class member. State Farm has failed to demonstrate that its affirmative defense regarding Schlehuber is so unique that it threatens to become the focus of the litigation.

**2**

Having satisfied Rule 23(a)'s prerequisites, Plaintiffs must also satisfy "the requirements of one of the types of classes in Rule 23(b)."

*Devaughn*, 594 F.3d at 1194; Fed. R. Civ. P. 23(b). Plaintiffs contend that certification for their breach claim is appropriate under Rule 23(b)(3) and for their declaratory action under Rule 23(b)(2). Doc. 69 at 20, 34.

**a**

For Plaintiffs' breach claim, they have shown that common issues are more central and important than individualized issues and that a class action is superior to other methods of adjudication. They therefore satisfy the requirements for the proposed class to be certified under Rule 23(b)(3).

**i**

To certify their class under Rule 23(b)(3), Plaintiffs first must satisfy that Rule's predominance inquiry. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). In short, predominance requires first identifying each aspect of a claim and categorizing whether each aspect is individualized or common based on the inquiry and proofs required, and then weighing the common questions against the individualized questions. *Id.* at 1087; *see also Wallace*, 725 F.3d at 1220. Where the injury is common to the class and stems from the same legal theory, common questions are more likely to predominate. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Common questions predominate over any individualized ones. Under Plaintiffs' theory, their proposed class must prove that State Farm's application of a typical negotiation adjustment breaches its promise to pay the actual cash value of a totaled vehicle. Doc. 69 at 21–22. In addition, they must prove that Audatex's valuation of the class members' vehicles is an accurate measure of the vehicles' actual cash value once the typical negotiation adjustment is removed from that calculation. *Id.* at 22. Both questions are common because they are susceptible to common legal proof that will settle those questions for the entire class at once. *See Amgen Inc.*, 568 U.S. at 469. And each putative class member's alleged injury is the same: underpayment of the vehicle's actual cash value. Doc. 69 at 25–26. Lastly, if Plaintiffs succeed, calculating individual damages will be straightforward. Each class member gets the difference between Audatex's original calculation and Audatex's calculation with the typical negotiation adjustment removed.

31

Doc. 69 at 26; *See Menocal*, 882 F.3d at 927 (finding that a damages model allowing damages to be "easily calculable using a simple formula" supports a finding of predominance).

State Farm opposes predominance for three main reasons. First, it argues that individualized issues regarding breach and injury predominate over the class-wide issues Plaintiffs identified. Doc. 102 at 21. Second, it argues that Plaintiffs' damages model does not match their theory of liability. *Id.* at 33. Finally, State Farm contends that its accord-and-satisfaction affirmative defense will overwhelm any common issues because the defense requires individualized inquiries. *Id.* at 34. State Farm's argument fail to persuade.

**1.** State Farm's primary argument against predominance is that Plaintiffs' claims require an individualized inquiry into whether State Farm breached its duty to pay each class member actual cash value. Doc. 102 at 21–33. In particular, State Farm contends that Plaintiffs' breach of contract claim requires Plaintiffs to show that State Farm paid each putative class member less than the actual cash value of their vehicles. *Id.* at 21–22. According to State Farm, anyone who received an amount equal to or more than the actual cash value of his or her vehicle cannot prove breach or injury, even if they prove that the typical negotiation adjustment is invalid. *Id.* at 23. State Farm asserts that this inquiry is an individualized one that "turns on vehicle-specific factors like mileage, options, condition, dealer reconditioning, prior accidents, and other circumstances existing at the time of the loss." *Id.* at 27.

State Farm's argument ignores Plaintiffs' theory of liability. Plaintiffs' allegations rely on the validity of the typical negotiation adjustment. Doc. 69 at 21–25. Their entire theory is that the implementation of Audadex's typical negotiation adjustment is "categorically illegitimate." *Volino v. Progressive Casualty Ins. Co.*, 21 Civ. 6243, 22 Civ. 1714, 2023 WL 2532836, at *7 (S.D.N.Y. Mar. 16, 2023) (rejecting an argument identical to the one State Farm makes in a similar case). And Plaintiffs may establish this with common proof, including expert testimony about the used-vehicle market and evidence regarding the relationship between used vehicles' advertised price and their sales price. Doc. 69 at 26; *See Menocal*, 882 F.3d at 925–26 (finding predominance even when the element the plaintiffs needed to prove required a fact-intensive inquiry because the plaintiffs' theory relied on fact shared amongst the class). Under Plaintiffs' theory, the vehicle-specific factors that State Farm discusses have already been considered in Audatex's

methodology. Doc. 69 at 16. Plaintiffs agree with each step of Audatex's methodology *except* the typical negotiation adjustment, so the validity of that adjustment is necessarily "at the center of this action." *Drummond*, 2023 WL 5181596, at *10 (finding predominance in a factually similar case for this reason). The validity of that adjustment is susceptible to Plaintiffs' common proof, supporting a finding of predominance. *See Amgen Inc.*, 568 U.S. at 468 (explaining that individual questions will not overwhelm common issues where the plaintiffs' failure to prove the common issue in their favor "would end the case for one and all"); *CGC Holding Co.*, 773 F.3d at 1093.

The injury element of Plaintiffs' breach claim is also susceptible to common proof. Because Plaintiffs agree with everything in Audatex's methodology except the negotiation adjustment, they argue that each class member was injured by the exact amount that Audatex downwardly adjusted their claim based on the allegedly impermissible deduction. Doc. 69 at 16–17. State Farm argues that accepting Plaintiffs' theory for class-certification purposes would mean that "once a plaintiff offers *any* purported classwide means of estimating actual cash value, however arbitrary or selective, that eliminates the predominance problem that arises from the need to determine individually the value of each class member's vehicle." Doc. 102 at 30. That argument is rejected. As other courts have recognized, State Farm "can hardly complain that the methodology Plaintiffs would impose on them is the one [State Farm] chose and developed." *Clippinger*, 2023 WL 7213796, at *14 (quoting *Volino*, 2023 WL 2532836, at *9). A factfinder need not accept Plaintiffs' common proof, but that does not mean that Plaintiffs have not shown that common proof exists. *See Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1185 (10th Cir. 2023) ("The predominance inquiry at class certification asks to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries—not whether such issues are likely to be resolved in Plaintiffs' favor."). Nor does Plaintiffs' theory of damages defeat predominance. *Contra* Doc. 102 at 31. The Tenth Circuit has repeatedly held that individualized inquiries into damages calculations cannot defeat a finding of predominance. *See Sherman*, 84 F.4th at 1195–96.

State Farm's contrary authority is distinguishable. It first points to *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022). In many ways, *Lara* is factually similar: The plaintiffs challenge a downward adjustment that the insurance company's vendor applied to account for the difference between the average price for which a private individual

would sell a used vehicle and the average price that a dealership would sell for. *Id.* at 1136–37. But the plaintiffs in *Lara* set forth a different theory than the one Plaintiffs introduce here. Instead of challenging the validity of the adjustment itself, the plaintiffs claimed that the insurance company violated state-law insurance regulations "by not itemizing or explaining this downward 'condition adjustment,' which makes it impossible to verify." *Id.* at 1137. Although they argued that Progressive violated state law, they did not produce any common proof of their vehicles' actual cash value and, in fact, they did not even argue that each class member was injured by receiving less than actual cash value. *Id.* at 1138. Rather, they argued that Progressive injured them by not explaining the adjustment. *Id.* By contrast, the crux of Plaintiffs' claims in this case is that the typical negotiation adjustment was applied to each putative class member's total-loss claim to artificially reduce the calculation to something below the vehicle's actual cash value. As explained above, this question predominates. *See Menocal*, 882 F.3d at 925–26.

Another case State Farm cites, *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414 (5th Cir. 2023), is similarly distinguishable. In *Sampson*, the plaintiffs argued that the values in the National Automobile Dealers Association guidebook are the correct measure of a vehicle's actual cash value, and they were paid less than that. *Id.* at 420–21. The court found that this theory rested on an arbitrary model of liability because the plaintiffs ignored other legally permissible methods of measuring a vehicle's actual cash value. *Id.* at 422–23. Predominance did not exist because the insurance company had "the due process right to argue, for each individual plaintiff, that damages should be determined by a different legally permissible method that would produce lower damages than [the guidebook] (or no damages at all)." *Id.* at 420. While State Farm makes the same argument that prevailed in *Sampson*, it cannot prevail here because Plaintiffs did not choose an arbitrary theory of liability. Plaintiffs rest their theory on State Farm's own methodology, and they challenge a discrete portion of that methodology. Doc. 69 at 16–17. That is not an arbitrary choice like the one *Sampson* describes. *Reynolds*, 346 F.R.D. at 135 (distinguishing *Sampson* for this same reason); *Curran v. Progressive Direct Ins. Co.*, 345 F.R.D. 498, 509 n.8 (D. Colo. 2023) (same).

**2.** State Farm then argues that Plaintiffs' damages model does not match their theory of liability. Doc. 102 at 33. In particular, it denies that Plaintiffs can prove that "the Audatex vehicle valuation was too

low by *precisely* the amount" of the typical negotiation adjustment. *Id.* It says that "refunding the [typical negotiation adjustment] will necessarily overcompensate or undercompensate literally every class member depending on the 'true' actual cash value of each vehicle." *Id.* But Plaintiffs' damages model does just that. Plaintiffs argue that they are entitled to damages that amount to the exact typical negotiation adjustment calculation. Doc. 69 at 26–28. This reflects their liability theory: that the typical negotiation adjustment artificially reduces Audatex's otherwise valid measure of actual cash value. *Cf. Comcast Corp.*, 569 U.S. at 35 (finding that a model that measure damages attributable to four theories when only one was accepted for class-action treatment was improper).

**3.** Finally, State Farm contends that it intends to raise affirmative defenses that will overwhelm Plaintiffs' common issues. Doc. 102 at 34. In particular, State Farm intends to raise the affirmative defense of accord and satisfaction under Kansas law. *Id.* at 34–35. That affirmative defense requires State Farm to prove that it offered each class member a payment that would fully satisfy its obligation to pay the class member actual cash value and that the offer was "accompanied by such acts and declarations or made under such circumstances that the party to whom the offer is made is bound to understand that if he accepts the offer, it is in full satisfaction of and discharges the original obligation." *EF Hutton & Co. v. Heim*, 694 P.2d 445, 451 (Kan. 1985). State Farm says its defense requires it to prove a "meeting of the minds," meaning it must investigate each policyholder's subjective intent in accepting State Farm's payment. Doc. 102 at 35. Even if State Farm's affirmative defense will require some individualized inquiries, it is insufficient to defeat the common issues already described that are at the heart of this lawsuit. *Naylor Farms, Inc.*, 923 F.3d at 789 ("Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately"). Moreover, some of the evidence involved in proving State Farm's defenses—like whether there was a conspicuous statement that accepting State Farm's payment would have unanticipated legal consequences—may be shown through proof common to all class members. *See* Doc. 124 at 20–21. Plaintiffs need not show that every issue that may arise at trial is susceptible to common proof. *Naylor Farms, Inc.*, 923 F.3d at 789. They have sufficiently shown, however, that on balance, their common issues predominate over ones that may require individual evidence. *Menocal*, 882 F.3d at 920–21.

ii

Having shown predominance, Plaintiffs must also show that their proposed class action meets Rule 23(b)(3)'s superiority requirement. A plaintiff proceeding under Rule 23(b)(3) must show that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) includes an illustrative list of factors to consider, including the class members' interests in controlling the prosecution of separate actions; the extent and nature of any litigation already begun by or against class members; the desirability of concentrating the litigation of the claims; and the likely difficulties in managing a class action. *Id.*; *see also Menocal*, 882 F.3d at 915. At heart, the superiority inquiry contrasts class treatment with alternative methods of resolution and asks whether alternative methods are preferable. *Black*, 69 F.4th at 1190.

Class treatment is superior for two reasons. First, class members' individual economic injury—an average of $731—is likely to be too low to support independent prosecutions. Doc. 69 at 33. As the Tenth Circuit has noted, that is a strong reason to believe a class action is a superior procedural vehicle. *Menocal*, 882 F.3d at 915 (citing *Amchem*, 521 U.S. at 617). Moreover, as all putative plaintiffs have a common question as to liability, its resolution on a class-wide basis would substantially advance judicial economy and prevent State Farm from facing the possibility of inconsistent decisions. *See id.* State Farm's arguments against superiority largely echo their challenges to predominance, which have already been rejected.

Second, the alternative method of resolution that State Farm promotes is not preferable. State Farm contends that litigation is not a superior method to adjudicate Plaintiffs' claims because the policy language provides for appraisal as an alternative method to measure a totaled vehicle's actual cash value. Doc. 102 at 39. State Farm says appraisal is faster, less expensive, more manageable, and will provide the most accurate measure of each vehicle's actual cash value. *Id.* at 39–40.

State Farm's argument fails. State Farm points to no authority suggesting that an out-of-court appraisal is the type of alternative method of adjudication that Rule 23(b)(3) contemplates. The Tenth Circuit consistently treats the superiority inquiry as one that asks whether individual lawsuits or classwide litigation is the superior method of adjudication, regardless of what non-litigation options may exist for the parties. *See, e.g.*, *Menocal*, 882 F.3d at 917. Moreover, the Tenth Circuit

has explained that even if an alternative method exists for some individuals, it is sufficient that class treatment will "achieve economies of time, effort, and expense, and promote uniformity of decision as to person's similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *CGC Holding Co.*, 773 F.3d at 1096) (quoting *Amchem*, 521 U.S. at 615).

### b

Plaintiffs also seek to certify their declaratory action, this time invoking Fed. R. Civ. P. 23(b)(2). Doc. 69 at 34–36. Rule 23(b)(2) provides that "a class action may be maintained," in part, if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) imposes two independent but related requirements." *Shook v. Bd. of Cnty. Comm'rs of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). First, "the defendants' actions or inactions must be based on grounds generally applicable to all class members." *Id.* Second, the injunctive relief sought must "be appropriate for the class as a whole." *Id.*

Plaintiffs assert that the class could be certified under this Rule because "this case involves a uniform course of conduct and uniform interpretation of contractual language." Doc. 69 at 35. While this is true, certification under Rule 23(b)(2) is improper where monetary relief is sought and it is not incidental to injunctive or declaratory relief. *Dukes*, 564 U.S. at 360. Plaintiffs did not respond to State Farm's argument that Plaintiffs seek predominantly monetary relief that would require individualized inquiries. Doc. 102 at 46–48. And the parties' extensive pleadings regarding the class members' potential damages in this case supports State Farm's assertion that the primary relief Plaintiffs seek is money damages. As a result, certification under Rule 23(b)(2) is improper. *See Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004) (affirming the denial to certify a class under Rule 23(b)(2) where it was "clear from the pleadings … that the primary relief sought is monetary damages").

* * *

The class that Plaintiffs seek to certify meets all four of Rule 23(a)'s threshold requirements. And because Plaintiffs showed that Rule 23(b)'s predominance and superiority requirements are met, their

motion for class certification on their breach of contract claim is granted. The same is not true regarding Plaintiffs' request for declaratory relief though. The rule Plaintiffs invoked to certify a class for their declaratory action, Rule 23(b)(2), is not an appropriate vehicle for class certification where the primary relief sought is monetary damages. That is the case here, so Plaintiffs' motion to certify a class on their claim for declaratory relief is denied.

## C

State Farm finally moves for summary judgment. Doc. 77. That motion is denied because Plaintiffs have raised genuine disputes of material fact as to their breach of contract and declaratory judgment claims.

### 1

State Farm contends that Plaintiffs cannot survive summary judgment on their breach claim. Doc. 78 at 15–22. In Kansas, a breach of contract claim requires the existence of a contract between the parties, adequate consideration to support the contract, the plaintiff's performance or willingness to perform the contract, the defendant's breach of the contract, and damages to the plaintiff as a result of the breach.[5] *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013).

State Farm argues that Plaintiffs have not produced admissible evidence showing they were injured. Doc. 78 at 15–22. This is because, according to State Farm, Plaintiffs cannot establish that State Farm paid them less than the actual cash value of their totaled vehicles. *Id.* at 19–22. That argument fails. Plaintiffs have produced their expert Jason Merritt's report explaining Merritt's opinion that State Farm paid Plaintiffs less than the actual cash value of their respective vehicles because it applied an invalid downward adjustment to the vehicles' value. *See Janny v. Gamez*, 8 F.4th 883, 920 & n.6 (10th Cir. 2021) (finding that summary judgment is inappropriate when a jury might find in favor of plaintiff based on the plaintiff's view of the evidence); *Chadwick v. State*

---

[5] The parties agree that Kansas law governs this dispute. A federal court sitting in diversity must "apply the substantive law of the forum state." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014). That law arises from state statute and decisions of a state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

*Farm Mutual Auto. Ins. Co.*, No. 21-1161, 2024 WL 1156944, at *2 (E.D. Ark. Mar. 18, 2024) (finding that Merritt's opinions created a genuine dispute of material fact on damages in a case with identical facts).

State Farm appears to agree that its argument is viable only if Merritt's testimony is excluded. Doc. 118 at 12. But, as noted, that testimony has not been excluded. *See supra*, Section II.A.1. As a result, the parties have produced competing evidence about the validity of Audatex's typical negotiation adjustment and whether Audatex's methodology produces a sound estimate of a vehicle's actual cash value once that adjustment is removed. It is for a jury to determine which party's theory prevails. *See Adler*, 144 F.3d at 670 (holding that summary judgment is inappropriate if the competing evidence would permit a reasonable jury to decide the issue in either party's favor); *Chadwick*, 2024 WL 1156944, at *2 (reaching this same conclusion).

State Farm puts forth three additional reasons specific to Schlehuber to argue that she cannot show she was injured with respect to her Nissan or her Lexus. None are persuasive.

**1.** State Farm first argues that Schlehuber cannot prove injury because, according to State Farm, she agrees with the valuation of her Nissan. Doc. 78 at 22. This is because during Schlehuber's deposition, she was asked "Do you *disagree* with the value now?" Doc. 78 at ¶ 14 (emphasis added). Schlehuber responded, "no." *Id.* State Farm contends that this response "amounts to an accord and satisfaction." Doc. 118 at 12 (citing *Heim*, 694 P.2d at 451).

Kansas law recognizes accord and satisfaction as an affirmative defense. *Heim*, 694 P.2d at 451. The party asserting the defense must show "an offer in full satisfaction of an obligation, accompanied by such acts and declarations or made under such circumstances that the party to whom the offer is made is bound to understand that if he accepts the offer, it is in full satisfaction of and discharges the original obligation." *Id.* State Farm has not explained through argument or applicable authority how the elements of accord and satisfaction have been met. To do so, it would need to show that its valuation of Schlehuber's Nissan was "an offer in full satisfaction" of its obligation to pay Schlehuber the Nissan's actual cash value. *See Joski v. Country Life Ins. Co.*, No. 76,233, 1997 WL 35436062, at *6 (Kan. Ct. App. 1997) (finding that an insurance company failed to show accord and satisfaction when the plaintiff denied cashing the check in satisfaction of his

claims and the check included no language expressly indicating that it was an offer to settle the parties' dispute).

Viewing Schlehuber's testimony favorably to her and in full, there is a genuine dispute as to whether Schlehuber agreed with State Farm's valuation of her Nissan. For example, Schlehuber also testified in her depositions that the typical negotiation adjustment "was not clear in any of [her] previous claims that they take that amount out." Doc. 79-11 at 17. She also testified that she is "objecting to the negotiation deduction that they take." *Id.* at 30. Even assuming Schlehuber's response could rise to the level of accord and satisfaction, Schlehuber's full testimony creates a genuine dispute as to whether Schlehuber admitted that State Farm's valuation of her Nissan represented the actual cash value of her vehicle. *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1122 (10th Cir. 2021) (explaining that to "defeat a motion for summary judgment, a plaintiff, upon the defendant raising and supporting an affirmative defense, need only identify a disputed material fact relative *to the affirmative defense*") (emphasis in original). As a result, State Farm has not met its burden to prove the affirmative defense of accord and satisfaction as a matter of law. *See id.*; *Balmer Fund, Inc. v. City of Harper*, 294 F. Supp. 3d 1136, 1146 (D. Kan. 2018) (finding that a defendant could not meet its burden to show an accord and satisfaction defense under Kansas law when the defendant did not "identif[y] uncontroverted facts that satisfy the requirements for accord and satisfaction").

The legal authority State Farm cites does not change this result. First, State Farm relies on a quote from *Neonatal Prod. Grp., Inc. v. Shields*, 276 F. Supp. 3d 1120, 1149 (D. Kan. 2017): "Kansas law does not permit a party to sign an agreement as plain as this one to 'get the money' only to renounce the agreement they have signed." The context of that sentence in a non-binding judicial decision, however, shows facts different from the ones presented here.[6] In *Shields*, the

---

[6] Not only is *Shields* distinguishable, but federal trial courts in Kansas are bound to apply the holdings of the Supreme Court and the Tenth Circuit. *United States v. Maloid*, 71 F.4th 795, 808 (10th Cir. 2023) (describing vertical *stare decisis*), *cert denied*, 144 S. Ct. 1035 (2024); *see also Alexander v. Sandoval*, 532 U.S. 275, 282 (2001) (recognizing the Supreme Court is bound by a prior decision's holding, not language within the decision). The decisions of a "federal district court judge [are] not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

parties disputed what payments the defendant owed the plaintiff under the parties' agreement, so they entered a new, written agreement specifying the parties' obligations and expressly providing that the new agreement replaced the former one. *Shields*, 276 F. Supp. at 1149. State Farm, however, has not shown that the undisputed evidence establishes that Schlehuber's deposition testimony "produced an accord and satisfaction that discharged [State Farm's] obligation[]" to pay Schlehuber the actual cash value of her Nissan. *Id.*

State Farm's reliance on *Wellman v. Safeco Ins. Co. of Am.*, No. 14-166, 2016 WL 2757705 (E.D. Ky. May 11, 2016), is equally unavailing. That case involved a contract interpretation dispute regarding whether an insurance company needed to pay the difference between damaged property's actual cash value and its replacement or repair cost if the insured did not replace or repair the property. *Id.* at *3. After the contract was interpreted in the insurance company's favor, the plaintiffs contested the validity of the actual cash value payment. *Id.* at *4. That argument was rejected because the plaintiffs "fail[ed] to establish, or specifically allege how the payment was deficient" and they "admitted that the Actual Cash Value figure was not in dispute" in their depositions. *Id.* In contrast to that situation, Schlehuber has specifically explained her theory as to why State Farm's payment was deficient, and she has demonstrated a genuine issue of material fact as to whether she disputed the actual cash value figure.

**2.** State Farm then argues that Schlehuber has not shown that she was injured because State Farm sent her an additional payment after its expert appraiser valued Schlehuber's Nissan at a higher amount than Audatex did. Doc. 78 at 19–21. State Farm's expert, Megan O'Rourke, appraised Schlehuber's Nissan and concluded that its value exceeded Audatex's calculation by $577. Doc. 93 at ¶ 34. State Farm then sent Schlehuber the difference between its original payment and O'Rourke's calculation. *Id.* at ¶ 35. Schlehuber rejected the payment, viewing it as a "partial offer of settlement." State Farm disputes that characterization. *Id.* Regardless of whether the payment was a settlement offer, State Farm's argument fails because Schlehuber has produced sufficient evidence to show that the actual cash value of her Nissan was $13,113, *id.* at ¶ 31, which is still higher than O'Rourke's calculation of $12,500, *id.* at ¶ 34. As a result, Schlehuber has shown a material dispute as to whether she was injured. *See Halley v. Huckaby*, 902 F.3d 1136, 1152 (10th Cir. 2018) (finding summary judgment

inappropriate when a genuine issue of material fact existed regarding an essential element of the claim).

**3.** State Farm's final argument regarding Schlehuber's injuries is that Schlehuber did not suffer an injury regarding her totaled Lexus because she elected to owner-retain the vehicle. Doc. 78 at 23. State Farm paid Schlehuber the amount that it calculated as the Lexus's actual cash value, which was $6,415.43. Doc. 93 at ¶ 20. Schlehuber was able to repair the Lexus for less than repair costs that State Farm anticipated, and she traded it in two years later for $1,500. *Id.* at ¶ 22. State Farm contends that she was not injured because she "ultimately avoided any financial injury" by driving the vehicle for an additional two years and then trading it in. Doc. 78 at 23.

The only authority on which State Farm relies is inapposite. In the case State Farm cites, *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 460–61 (3d Cir. 2024), the plaintiffs argued that they might have received a higher payment if GEICO had not applied an invalid condition adjustment. But the Third Circuit in that case held that the plaintiffs did not suffer any "real-world financial injury" because GEICO itself applied "countervailing adjustments" that offset the downward adjustment. *Id.* at 460–61. State Farm offers no argument or authority to support its theory that Schlehuber was not injured by State Farm's alleged underpayment simply because she independently found a less expensive way to repair her vehicle.

**4.** To the extent Plaintiffs seek prospective, injunctive relief, State Farm is entitled to summary judgment. Plaintiffs' Complaint seeks "an order enjoining State Farm from basing the valuation and payment of claims on values of comparable vehicles that have been reduced by Typical Negotiation Adjustments." Doc. 50 at 12. State Farm contends that Plaintiffs lack standing to seek prospective relief because State Farm no longer applies a typical negotiation adjustment in Kansas. Doc. 78 at 27–28.

Plaintiffs have not "demonstrate[d] standing separately for each form of relief sought." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021). The risk of future harm, standing alone, is insufficient to establish a concrete harm for Article III standing purposes. *Id.* at 436–37; *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409 (2013) (reiterating that "threatened injury must be *certainly impending* to constitute injury in fact, and that [a]llegations of *possible* future injury are not sufficient"). Instead, a plaintiff must show that he or she "'has sustained or is

immediately in danger of sustaining some direct injury' as the result of the challenged . . . conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of L.A. v. Lyons*, 461 U.S. 95, 101–02 (1983) (internal citations omitted). Plaintiffs did not address State Farm's arguments regarding prospective relief. As a result, they have not met their burden to show any impending threat that State Farm will apply an invalid typical negotiation adjustment or that they are likely to make another total-loss claim with State Farm for such an adjustment to be applied. *See Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, [the plaintiff] is no more entitled to an injunction than any other citizen.").

### III

For the foregoing reasons, State Farm's Motions to Exclude Experts Kirk Felix, Doc. 73, Jason Merritt, Doc. 67, and to Strike Jason Merritt's Second Rebuttal Report, Doc. 126, are DENIED. Plaintiffs' Motion to Exclude Expert Philip Fernbach, Doc. 84, is DENIED, and their Motion to Exclude Expert Laurentius Marais, Doc. 82, is GRANTED in part and DENIED in part. Plaintiffs' Motion for Class Certification, Doc. 69, and State Farm's Motion for Summary Judgment, Doc. 77, are each GRANTED in part and DENIED in part.

It is so ordered.

Date: April 30, 2025                       s/ Toby Crouse
                                          Toby Crouse
                                          United States District Judge